# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHAHEENA KHAN,

        Plaintiff,

    v.

CHICAGO BOARD OF EDUCATION and
KAREN SAFFOLD,

        Defendants.

No. 16 CV 8668

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Shaheena Khan worked in the Chicago public school system for more than twenty years. After she became principal of an elementary school on the city's south side, conflict arose between Khan and her supervisor, defendant Karen Saffold. Khan filed complaints alleging that Saffold discriminated against her and abused the school's budgetary process. Saffold and other Chicago Board of Education employees weren't happy with Khan's performance, and their evaluations led to Khan's termination. Khan brings federal claims under the First Amendment and Title VII. Defendants move for summary judgment, and for the reasons discussed below, the motion is granted.

## I.    Legal Standard

A party moving for summary judgment must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all reasonable inferences in favor of Khan, the nonmoving party. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). Defendants bear the burden of establishing that the summary judgment standard is met, but Khan must put forward enough evidence to establish every element of her claims and show that she can carry her burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

Shaheena Khan became principal of Aldridge Elementary School, a Chicago public school, in 2013. [446] ¶ 2; *see* [433] ¶¶ 1, 8.[1] Located in Altgeld Gardens on the south side of the city, Aldridge served an impoverished and high-crime area. *See* [433] ¶ 2. The Chicago Board of Education and Khan contracted for her employment as principal twice, first in 2013 and again in 2016. *See* [433] ¶¶ 8–9; [446] ¶¶ 2, 21. Both

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Khan's response to defendants' joint Local Rule 56.1 statement, [433], and defendants' response to Khan's statement of additional facts, [446], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); N.D. Ill. Local R. 56.1(d)(4), and ignore additional facts included in response that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2). Plaintiff fails to properly controvert many of defendants' statement of facts, which are admitted. *See* [433] ¶¶ 2, 8, 12, 18, 20–21, 23–26, 28–31, 34–35, 37–38, 40–41, 43–46, 52–53, 56, 61–64, 66, 68, 70, 75–78, 80–88, 91, 93–94, 98–99, 113–15, 118, 121, 125–27, 130–33, 138–39, 142, 144, 146, 157. I ignore Khan's additional facts that do not controvert defendants' asserted facts, along with portions of Khan's statement of facts that are argumentative or unsupported by the record. *See* [446] ¶¶ 10, 15, 20, 22, 26, 30, 40, 43, 48. The parties dispute many facts, but the facts in those disputes aren't material. To the extent disputed facts are relevant, I include them in the light favorable to Khan.

contracts included a four-year term of employment, and a provision authorizing the Board to terminate Khan's contract pursuant to 105 ILCS 5/34-8.3. *See* [433] ¶¶ 8–9; [446] ¶¶ 2, 21.

### A. Khan's First Years as Principal

Chicago public schools were divided into networks, each led by a network chief. *See* [433] ¶ 12. Through its leadership and staff, each CPS network provided support, direction, and oversight to network schools. *See id.* ¶¶ 12, 20–21. When Khan began her principalship, Aldridge was part of the OS4 network. *Id.* ¶ 13. OS4 network chief Krish Mohip supervised Khan's work from 2013 to 2015. *Id.* ¶ 14; [446] ¶ 2.

According to Mohip, who regularly visited Aldridge, Khan had a good grasp of what was going on in her school and didn't require corrective action. [446] ¶¶ 5, 7. Mohip said that Khan was moving her school in the right direction, worked closely with her staff, and Aldridge's students had the materials that they needed. *Id.* ¶¶ 5, 7, 9. Cleanliness at Aldridge wasn't a regular problem. *Id.* ¶ 6. By some measures, Khan improved Aldridge's academic performance during her time as principal, particularly in math and reading. *See* [446] ¶¶ 8–9.[2] On the four-point scale used to evaluate CPS principals, Khan's overall ratings during the 2013–2014 and 2014–

---

[2] As Khan's immediate supervisor and a frequent observer at the school, it's reasonable to infer that Mohip had personal knowledge about details of the school's academic performance. *See* Fed. R. Evid. 602. According to CPS School Quality Rating Reports, Aldridge's reading growth was ranked in the seventh percentile in 2014, *see* [446] ¶ 8, the twenty-fifth percentile in 2015, *see* [439-4] at 2, and the sixty-eighth percentile in 2016. *See* [436-12] at 2. Between 2014 and 2015, Aldridge's third grade math growth improved twelve percent, and math growth for all Aldridge students improved by three percent. *See* [446] ¶ 9; [436-1] at 38–39. According to Mohip, Khan "went from being underperforming in growth to being performing in growth." [436-1] at 40.

3

2015 school years were 2.35 and 2.04, which both equated to "developing." *See* [433] ¶¶ 17–18.

**B.    Network 13 and Conflict with Saffold**

The OS4 network was disbanded in 2015, and Aldridge became part of CPS Network 13. [433] ¶ 19. Network 13 categorized its schools into three tiers, corresponding to the amount of support each school needed. *Id.* ¶ 24. During the 2015–2016 school year,[3] Aldridge was ranked in the third and lowest tier, which meant that "intensive support" was required and that Aldridge had a very low percentage of students performing at grade level or growing. *See id.* ¶ 25. Karen Saffold directed Network 13, and was charged with supporting, supervising, and evaluating Khan. *Id.* ¶ 20. According to the Board's attorney, Saffold was an agent of the Board's CEO. [446] ¶ 52.[4] Through newsletters, memos, and monthly meetings, Saffold and her staff communicated their expectations to all principals in the network during the 2015–2016 school year. *See* [433] ¶ 23.

Because Aldridge was new to Network 13 and required extra help, Saffold or someone from her staff visited the school at least once a week. *See* [433] ¶ 26. At the

---

[3] A school's tier rating reflected the past year's performance. *See* [419-29]. In other words, Aldridge's tier three status during the 2015–2016 school year was based on the school's performance during the 2014–2015 school year. *See id.* Khan attempts to dispute that Aldridge was rated as tier three during the 2015–2016 school year, but none of the facts she asserts—about other annual ratings and improvements—controvert the asserted fact, which is admitted.

[4] The Board attorney's statement to Khan's attorney isn't hearsay because it's reasonable to infer that it was made by the Board's agent or employee on a matter within the scope of that relationship and while it lasted. Fed. R. Evid. 801(d)(2)(D); *see Mister v. Northeast Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009). The statement is admissible as evidence of the Saffold's authority, and isn't merely a legal conclusion.

4

start of the 2015–2016 school year, network staff noticed that Khan hadn't timely completed many of their expectations. *Id.* ¶ 29. In written notes, they documented a number of problems at Khan's school. *Id.* ¶ 31. Network staff discussed Aldridge weekly, and shared plans and strategies to improve problem areas with Khan. *See id.* ¶ 30.

According to Khan, however, when Network 13 staff arrived, she had a plan already in place and approved by Mohip, and wasn't aware of Saffold's expectations. *See* [433] ¶¶ 23, 29; [436-8] at ¶ 4. Khan also said that Saffold and her staff yelled at her and never answered her questions, *see* [433] ¶ 36; [446] ¶ 15; [436-4] at 255–259; [436-8] ¶ 21, and that the visits from Network 13 staff were harassing. [446] ¶¶ 44.

Saffold met with her supervisor, Chief of School Strategy and Planning, Elizabet Kirby, [446] ¶ 32; [433] ¶ 22, to discuss the lack of systems at Aldridge and Khan's failure to meet expectations. [433] ¶ 34. Saffold then met with Khan to discuss the network's expectations. [433] ¶ 36. There's a dispute as to the tenor of this meeting: Saffold said she listened to Khan's needs and concerns and offered support, *see* [419-12] ¶ 28, while Khan said Saffold and her deputy yelled and screamed at her. *See* [436-4] at 254–55.

Khan and Saffold disagreed about how Aldridge should be run. *See* [446] ¶ 16. Khan said that Saffold pressured her to make school supply purchases and procure services from Saffold's "people." *Id.* ¶ 11.[5] When Khan refused, Saffold told Khan that

---

[5] Khan had personal knowledge of her interactions with Saffold. *See* Fed. R. Evid. 602. Her affidavit is itself evidence and does not require additional support. Fed. R. Civ. P. 56(c)(4); *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (cleaned up) (A party may use an affidavit to oppose a motion for summary judgment where "the affidavit (1) attests to facts of which

she would "put paper" on Khan, which Khan understood to mean that Saffold would make false complaints against her. *Id.* Saffold wanted Khan to encourage teachers to coach students while they took standardized tests, but Khan refused to do that, too. *Id.* ¶ 13. Khan also said that Saffold restricted Khan's access to the CPS budget system and spent Aldridge funds in violation of the Board's procurement rules. *Id.* ¶¶ 14, 16, 42.

## C. The Corrective Action Plan and Khan's Termination

Based on Khan's poor performance, failure to make progress, and Aldridge's academic data, Saffold recommended to her supervisors that Khan be issued a corrective action plan. *See* [433] ¶¶ 42, 48. Such plans generally served as a form of professional support to underperforming principals, documenting problems, and providing an opportunity to talk about ways to improve. *See id.* ¶ 42. CPS guidelines said that the Board's CEO or a designee could issue a corrective action plan when they determined that a principal needed immediate correction. *See id.* ¶ 43. In deciding whether a principal should be issued a corrective action plan, Kirby generally relied on the expertise of network chiefs, her own experience, and

---

the affiant has personal knowledge; (2) sets out facts that would be admissible in evidence; and (3) shows that the affiant or declarant is competent to testify on the matters stated."). What Saffold told Khan—*see* [446] ¶¶ 11, 13—isn't hearsay because Saffold is a party-opponent. *See* Fed. R. Evid. 801(2)(A). I ignore defendants' general, repetitive objection to Khan's reliance on her affidavit because it "contains inadmissible hearsay," *see* [446] ¶ 14, but review the statements in those portions of the affidavit that Khan cites to ensure that plaintiff relies on admissible evidence.

considered factors like leadership, the existence of a strong plan to improve student achievement, and a principal's ability to execute. *See id.* ¶ 49; [436-2] at 156–157.

Kirby approved Saffold's recommendation to issue a corrective action plan to Khan. [433] ¶ 48. Saffold prepared the plan, reviewed it with CPS's Office of Principal Quality, Kirby, and the Board's attorney, and met with Khan about the document. *Id.* ¶¶ 50, 51; *see* [420-11]. The plan's stated goal was to "provide [Khan] with an opportunity to remediate [her] performance," and was to run from February 5 to June 20, 2016. [433] ¶¶ 52–53. The plan included a description of problems with Khan's performance, steps Khan needed to take, resources and support available, and a warning that failure to successfully complete the plan could result in termination or removal. *Id.* ¶ 54. A few days after the start of the corrective action plan period, Khan's attorney sent a letter to the Board contesting the basis for the plan, contending that Khan couldn't reasonably be expected to understand or comply with it, and instructing the Board to direct all future communications about the plan to him. *See id.* ¶ 55.

Saffold told Khan to place documents demonstrating progress into an online folder. [433] ¶ 56. When the first deadline for document submission arrived, however, Khan didn't upload the requested documents. *Id.* ¶ 57. Instead, her attorney sent Saffold a letter that said that he represented Khan in relation to the plan and that

concerns or questions should be directed to him. *Id*. The parties dispute whether Khan ever submitted the requested documents. *Id*. ¶ 59; *see* [446] ¶ 38.[6]

A few months later—in March and April 2016—Saffold determined that Khan hadn't made progress on the corrective action plan. *See* [433] ¶ 62. The Board's attorney sent an email to the general counsel for the Chicago Principal's and Administrator's Association, offering to settle Khan's case and stop the disciplinary process. *See id*. ¶¶ 64–65. Attorneys for the Association, Khan, and the Board met to discuss Khan's employment situation, but didn't reach any agreement. *Id*. ¶ 67.

When a principal failed to make adequate progress toward completing a corrective action plan, the Board would generally issue a warning resolution. *See* [433] ¶¶ 45, 63, 68. In Khan's case, however, the Board's attorney delayed the resolution in order to investigate Khan's allegations of discrimination and budgetary problems (discussed below), and to give Khan more time to show that she was making progress. *Id*. ¶ 68.

Brian Ali, Director of Academic Support at the Office of Principal Quality, was assigned to observe Khan and provide support. [446] ¶¶ 69–70. Khan presented a plan for Aldridge as part of the CPS principal evaluation process, but Ali said her presentation was flawed. *Id*. ¶¶ 71–73. Ali visited Aldridge and noticed climate and culture issues, including a lack of orderliness and problems with student discipline. *Id*. ¶ 74. Ali said his observations lined up with the problems described in the

---

[6] Khan's affidavit is evidence that she submitted the documents, and does not require additional evidentiary support. *See* Fed. R. Civ. P. 56(c)(4).

corrective action plan, and didn't believe that Khan had done anything to fix the issues. *Id.* ¶ 75. For the 2015–2016 school year, Khan received an overall performance score of 1.45, equating to "unsatisfactory." *Id.* ¶ 76.

The Board adopted a warning resolution in June 2016, informing Khan that she had "engaged in unsatisfactory conduct" by failing to complete her corrective action plan and that the Board would fire her if the problem wasn't immediately fixed. [433] ¶ 78. Khan received the warning resolution. *Id.* ¶ 80. At a July 2016 meeting, Saffold and another network chief told Khan that the end date for her corrective action plan had been extended. *Id.* ¶ 81. A memorandum delivered to Khan said that she needed to produce a comprehensive plan for Aldridge for the next school year, and that later that month Saffold and Ali would decide whether Khan had successfully completed the corrective action plan. *Id.* ¶¶ 81–83. The memorandum warned that failure to complete the plan could result in Khan's removal as principal. *Id.* ¶ 83.

On four occasions in July, Khan met with Ali, Saffold, or Saffold's assistant to talk about her progress. [433] ¶ 85. When time was up, Saffold and Ali concluded that Khan hadn't met the requirements of the corrective action plan. *Id.* ¶¶ 86–87. Kirby and her superior recommended that Khan be removed as principal of Aldridge, pending the outcome of a formal removal hearing. *Id.* ¶ 90.[7] The Board's CEO

---

[7] Kirby said that the corrective action plan process was "really about the overall spirit of the [plan]," rather than "the corrective action plan to the exact letter." *See* [446] ¶ 32; [436-2] at 177. Kirby also said that Khan didn't accomplish goals of the plan in areas that weren't that difficult. [433] ¶ 88; [419-7] at 179.

approved their recommendation. *Id*. On August 24, 2016, Saffold, Ali and an HR representative met with Khan, and gave her a final assessment under the corrective action plan and a letter that said Khan was being reassigned. *Id*. ¶¶ 91–92; [446] ¶ 22. Khan's reassignment letter said that Khan was reassigned to work from home with pay. [433] ¶ 93; *see* [446] ¶ 22. According to Khan, the Board's HR representative said that Khan's "employment as principal was terminated." [446] ¶ 22.[8]

The CEO scheduled a hearing to determine whether Khan's removal as principal of Aldridge was appropriate. [433] ¶ 115. Postponed for eight months, *see id*. ¶ 116, that hearing was eventually held in May and June 2017. *Id*. ¶ 117; [446] ¶¶ 23–24, 39, 58. The hearing officer prepared a written report advising the CEO that sufficient evidence existed to support Khan's removal. [433] ¶ 121.

Around the same time, the Board directed Khan to report back to work. [433] ¶ 129.[9] Khan didn't report, and on June 19, 2017, the Board advised Khan that she was required to return to work within ten days or would be fired. *Id*. ¶ 130. Having learned that Khan was working at a school district in Ohio, the Board initiated disciplinary charges against her for violation of residency policies. *Id*. ¶¶ 133–34. The

---

[8] Khan had personal knowledge of the meeting she attended with HR, Saffold, and Ali. *See* Fed. R. Evid. 602. The HR official's statement to Khan that her "employment as principal was terminated" isn't hearsay because Khan offers it against the Board (a party-opponent) and it's reasonable to infer that it was made by the Board's agent or employee (the HR official) concerning a matter within the scope of the agency or employment, made during the existence of the relationship. *See Mister v. Northeast Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009); Fed. R. 801(d)(2)(D).

[9] Khan said that she never received notice to return to work. *See* [433] ¶ 129.

Board scheduled another hearing for August 16, 2017, but Khan failed to appear. *Id*. ¶¶ 134–35.[10] Eleven days later, the Board fired her. *Id*. ¶¶ 123, 136.

### D. Khan's Complaints, EEOC Charge, and Lawsuits

After Aldridge was reassigned to Network 13 (and Saffold took over as Khan's supervisor), Khan made a series of complaints to various authorities. In September or October 2015, Khan complained to CPS HR about Saffold. [446] ¶ 12.[11] In November or December 2015, she complained to CPS HR and to Kirby, alleging that Saffold interfered with Aldridge's budget and discriminated against her. [433] ¶ 138; [446] ¶¶ 14–15, 43.

Khan sent a letter to the Board's Office of Inspector General, and said that Saffold pressured Khan to make certain purchasing decisions, stripped Khan of authority to approve purchases, and that Saffold made an unnecessary purchase. [443] ¶ 141; [446] ¶¶ 16, 18. The Inspector General found no evidence that Saffold had done anything wrong. *See* [433] ¶ 142.

In April, May, and October 2016, Khan's attorney wrote to the Board's Equal Opportunity Compliance Office, alleging that Saffold discriminated against Khan on the basis of her religion and race. [433] ¶ 143. That office investigated Khan's claims, but concluded that there was no evidence to support them. *Id*. ¶ 144. In July 2016,

---

[10] Khan disputes whether she received notice of this hearing. *See* [433] ¶¶ 134–35.

[11] According to Khan, the HR official later told Khan that she had spoken with Saffold about Khan's complaint. [446] ¶ 12. What the HR official said to Saffold (as related to Khan) isn't hearsay because it was made by the Board's agent or employee on a matter within the scope of that relationship and while it lasted. *See* Fed. R. Evid. 801(d)(2)(D), 805; *Mister v. Northeast Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009).

11

Khan filed a charge with the EEOC, alleging retaliation and discrimination on the basis of her race, sex, and religion. *Id.* ¶ 149. The EEOC issued Khan a right-to-sue letter in October 2016. *Id.* That same month, Khan complained about Saffold to the Illinois State Board of Education, [433] ¶ 147, and, in July of 2017, sent a complaint to the U.S. Department of Education. *Id.* ¶ 148. In November 2017, Khan filed a charge with the Illinois Department of Human Rights alleging retaliation. *Id.* ¶ 150.

Khan said that her complaints led to Saffold's harassment—including being yelled at, and degraded and humiliated in front of her staff—and that she was removed from her position in retaliation for her complaints. *See* [446] ¶¶ 43, 45. Khan also said that Saffold discriminated against her because Khan was Black. *Id.* ¶ 46. Saffold said that she was aware that Khan had complained to the Board's Office of Inspector General and the Equal Opportunity Compliance Office because both offices interviewed Saffold. [433] ¶ 145. Saffold didn't know about Khan's complaints to agencies outside the Board, and Khan didn't tell any other Board employees about those complaints. *Id.* ¶ 152.

Khan filed this lawsuit in federal court in September 2016. *See* [1]. After she was fired, Khan filed a second lawsuit in federal court. *See Khan v. Bd. of Educ. of the City of Chicago*, 17 CV 9300, Dkt. No. 1 (N.D. Ill.). Those cases were consolidated. *See* [411]. At the time defendants filed their motion for summary judgment, [416], thirteen of Khan's claims remained. Khan's claims from her fifth amended complaint in this case include (1) First Amendment retaliation under 42 U.S.C. § 1983; (2) Title VII retaliation; (3) Title VII religious discrimination; (4) Title VII gender

12

discrimination; (5) contract reformation; and (6) tortious interference with contract. *See* [258]. Remaining claims from her second (consolidated) case include (1) breach of contract; (2) violation of the Personnel Records Review Act; (3) violation of the Illinois Wage Payment Collections Act; (4) retaliation under the IWPCA; (5) common law writ of certiorari; (6) violation of the Employee Retirement Income Security Act; and (7) violation of the Consolidated Omnibus Budget Reconciliation Act. *See Khan*, 17 CV 9300, Dkt. Nos. 29, 57 (N.D. Ill).

## III. Analysis

### A. Plaintiff's Motion to Dismiss Some Claims

Khan moves to dismiss five of her claims. [430]. She wants the claims for reformation, Title VII religious and gender discrimination, and violation of COBRA to be dismissed with prejudice, and her claim under ERISA dismissed without prejudice. *See id.* ¶¶ 5–7.

Amendment of Khan's ERISA claim would be futile. Khan acknowledges that binding Seventh Circuit precedent defeats that claim, but holds out hope that the Supreme Court will overrule the Seventh Circuit. *See* [430] ¶ 5. That unlikely scenario isn't enough to show how Khan could cure the defects in her complaint. *See* Fed. R. Civ. P. 41(a)(2); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (citations omitted) ("[A] district court does not abuse its discretion by denying a motion for leave to amend when the plaintiff fails to establish that the proposed amendment would cure the deficiencies identified in the earlier complaint."). Additionally, given the late stage of the case, dismissal of Khan's ERISA claim with

prejudice is appropriate. *See* Fed. R. Civ. P. 41(a)(2) ("[A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.").

Plaintiff's motion is granted. Khan's claims for reformation, Title VII discrimination, and for violation of COBRA and ERISA are dismissed with prejudice.

## B. Section 1983

### 1. *First Amendment*

Khan alleges that after she filed complaints with the Board and other state and federal agencies, the Board retaliated by threatening her, publishing a warning resolution, removing her from her position, and terminating her employment. [434] at 28–36; [258] ¶¶ 118–130. The Board argues that Khan can't show that her injury is traceable to a policy, custom, or action by a final policymaker, and that Khan's speech wasn't protected by the First Amendment. [417] at 18–23.

Section 1983 creates a right of action against persons who violate another's federal rights while acting under color of state law. 42 U.S.C. § 1983; *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (citing *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). Municipalities and other local government units are persons who can be sued under § 1983. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). But local government units like the Board are liable for the constitutional torts of their employees or agents only "when execution of a government's policy or custom ... inflicts the injury." *Id.* at 694; *see Milestone v. City of Monroe, Wisconsin*, 665 F.3d 774, 780 (7th Cir. 2011). To show that a constitutional

deprivation was caused by local government action, Khan must allege "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

Khan argues that Saffold was a final policymaker and that the Board ratified her actions. *See* [434] at 29–30.[12] State law decides which individuals are final policymakers. *Darchak v. City of Chicago Bd. Of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (citing *McMillian v. Monroe Cnty., Alabama*, 520 U.S. 781, 786 (1997)). While final policymaking authority can be delegated by an official who has that authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), under a delegation theory "the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions." *Darchak*, 580 F.3d at 630. If an official's policy decisions are reviewed by another—higher—decisionmaker, that's not final policymaking authority. *See Rasche v. Vill. of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003) (quoting *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464,

---

[12] While the complaint says that Khan's injury was caused by the Board's policies and practices, *see* [258] ¶¶ 126–128, Khan's brief only addresses a policymaker theory of local government liability. *See* [434] at 29–30. Khan has forfeited arguments as to other theories of government liability under *Monell*. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (citing *Witte v. Wisconsin Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006)) (a nonmovant forfeits arguments she fails to raise in a brief opposing summary judgment).

469 (7th Cir. 2001)). To prove that a final policymaker ratified a decision, Khan must show that the Board's CEO approved both Saffold's "decision and the basis for it." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 800 (7th Cir. 2016) (quoting *Darchak*, 580 F.3d at 630).

In an email to Khan's attorney, the Board's deputy general counsel wrote that "Karen Saffold is the duly authorized agent of the Board's CEO," and that Saffold's "action of removing Ms. Khan from Aldridge School has been approved by the CEO." [440-5] at 2; *see* [446] ¶ 52. Khan reasons that Saffold was a final policymaker because she was delegated authority by the Board's CEO. *See* [434] at 29–30. The Board attorney's email supports the proposition that the CEO delegated *some* decision-making authority to Saffold, but Khan presents no evidence that the Board entrusted Saffold with the power to create employment policy. *See Darchak*, 580 F.3d at 630 ("Policymaking is broader than decisionmaking."); *Gernetzke*, 274 F.3d at 469. Even if Saffold's decision to remove Khan from her position was policymaking, the record suggests that her decision was "approved" by the CEO. *See* [440-5] at 2. Khan hasn't shown that Saffold had *final* policymaking authority. *See Rasche*, 336 F.3d at 600. Similarly, Khan's ratification theory fails because she hasn't shown that the CEO approved the (allegedly retaliatory) basis behind Saffold's decision. *See Palka v. City of Chicago*, 662 F.3d 428, 435 (7th Cir. 2011) ("[T]o succeed on a 'ratification' theory ... a plaintiff must establish that the 'ratifying' authority shared the unconstitutional motivation of the initial decisionmaker."); *Baskin v. City of Des Plains*, 138 F.3d 701, 705 (7th Cir. 1998) (citations omitted).

Khan hasn't shown that Saffold's conduct is attributable to the Board under § 1983. *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Her First Amendment retaliation claim has another problem, too. Even if she had succeeded in showing that the Board was responsible for Saffold's conduct, Khan hasn't shown that her complaints were protected speech. *See Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).

The First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern. *See Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Whether Khan's speech is protected is a question of law. *See Ulrey v. Reichart*, 941 F.3d 255, 259 (7th Cir. 2019) (citing *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)). To succeed on a First Amendment claim against her former employer, Khan must show that she spoke "in her capacity as a private citizen and not as an employee." *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013) (citing *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008)). Generally, protection of a government employee's exposure of misconduct at work is found in whistleblower and labor laws, rather than in the Constitution. *See Garcetti*, 547 U.S. at 425.

At issue here are Khan's complaints to the Board's Office of Inspector General, HR, and Kirby. *See* [434] at 29; [446] ¶¶ 12, 14–16, 18, 43; [433] ¶¶ 138, 141, 149.[13]

---

[13] Khan also argues that her complaint to the EEOC was protected speech, *see* [434] at 29, but hasn't shown that the Board knew about that complaint. *See* [433] ¶ 152; [446] ¶ 46. Because she hasn't shown that the Board was aware of her EEOC complaint, Khan can't prove that it was "at least a motivating factor" in the Board's decision making, and so even if the EEOC complaint was protected speech, it wasn't causally related to the Board's actions and can't be the basis for her First Amendment claim. *Bridges v. Gilbert*, 557 F.3d 541, 546

Khan complained to the CPS HR department about Saffold's conduct, but didn't say what conduct she complained about. [446] ¶ 12; [436-8] ¶ 15. Khan later complained to HR and Kirby, and said that Saffold interfered with Aldridge's budget and discriminated against her. [433] ¶ 138; [446] ¶¶ 14–15, 43. Khan sent a letter to the Board's OIG claiming that Saffold pressured Khan to make certain purchasing decisions, stripped Khan of authority to approve purchases, and that Saffold made an unnecessary purchase. [433] ¶ 141; [446] ¶¶ 16, 18.

As a CPS Principal, Khan had a duty to report certain ethical violations—including conflicted transactions—to the Board's ethics advisor. *See* [422-21] at 8–9, 14; [433] ¶ 11. The parties dispute the significance of that duty, but that's not really the issue here. Khan argues that the duty didn't apply to her complaints about a superior, *see* [434] at 30, but the ethical guidelines weren't limited to reporting the misconduct of subordinates. *See* [422-21] at 14 ("Any Official or Supervisor who knows or has reason to know that this Code of Ethics may have been violated must report the matter to the Ethics Advisor."). The procedure required Khan to report misconduct to the ethics advisor, *see id.*, but Khan made reports to HR, Kirby, and the OIG. *See* [434] at 29; [446] ¶¶ 12, 14–16, 18, 43; [433] ¶¶ 138, 141, 149. Khan's speech didn't follow the letter of her job duties, but the complaints were still made "pursuant to" those duties, which aren't the same as Khan's "legal obligations or job

---

(7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)); *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) (A showing that an adverse action was motivated by protected speech requires that a plaintiff "demonstrate that defendants knew of the protected speech.").

description." *McArdle*, 705 F.3d at 754; *Kubiak*, 810 F.3d at 481 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)) ("Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description.").

Khan's job duties included the provision of appropriate learning materials and administrative management at Aldridge. *See* [433] ¶ 10; 105 ILCS 5/34-8.1 ("Each principal shall assume administrative responsibility and instructional leadership, in accordance with reasonable rules and regulations of the board, for the planning, operation and evaluation of the educational program of the attendance center to which he is assigned."). Khan's complaints about Saffold's expenditures and budgetary practices were made pursuant to those duties, and were made in her capacity as an employee, not as a private citizen. *See McArdle*, 705 F.3d at 754 (a school principal's complaints about financial irregularities involving her superior were made in her capacity as a public employee because the school's "reputation, its adherence to district policies, and its finances" were all within the principal's oversight and "directly affected her area of responsibility"); *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (a professor's complaints about the misuse of a grant project that he "was in charge of administering" were made in his capacity as an employee, not a private citizen); *cf. Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 793–94 (7th Cir. 2016) (speech concerning public corruption is made in a private capacity when a public employee isn't "responsible" for the area of work at issue).[14]

---

[14] *Chaklos*—which emphasizes a practical inquiry into the real expectations for employees, rather than a focus on formal job descriptions—is not inconsistent with this proposition.

Khan also reported harassment and discrimination by Saffold (a superior) to another superior and to HR. [433] ¶ 138; [446] ¶¶ 14–15, 43. Generally, employees who are "verbally assaulted by a colleague" are expected to report "inappropriate behavior to a supervisor." *Kubiak*, 810 F.3d at 481–82. While reporting harassment and discrimination by a superior may not have fallen within Khan's official duties as a principal, Khan's complaints were "intimately connected with her job." *Id.* (quoting *Davis v. Cook Cnty.*, 534 F.3d 650, 653 (7th Cir. 2008)); *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Khan complained to authorities within CPS that Saffold treated her inappropriately at work by yelling at her, harassing her, and discriminating against her. *See* [433] ¶ 138; [446] ¶¶ 14–15, 43. Khan's complaints were made in her capacity as an employee, and were an "attempt to improve her work environment so that she would not be harassed again." *Kubiak*, 810 F.3d at 482 (citing *Davis*, 534 F.3d at 653).

Khan hasn't shown that the Board's actions caused her deprivation, or that her complaints were protected speech causally related to her injury. The Board's motion for summary judgment on the First Amendment claim is granted.

---

*Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009). And *Garcetti* cautions against an "excessively broad" job description, *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006), but here, Khan's ordinary, narrowly understood duties as a school principal encompass the speech at issue.

2.    *Due Process*

Khan spends much of her brief arguing that the Board violated her due process rights. *See* [434] at 14–25. That's a problem because Khan has no pending due process claim.

Khan brought a procedural due process claim against the Board in one of her original complaints. *See Khan v. Bd. of Educ. of City of Chicago*, No. 17 CV 9300, 2018 WL 6192191, at *5 (N.D. Ill. Nov. 28, 2018). I granted the Board's motion to dismiss that claim—construed as being brought under 42 U.S.C. § 1983—for two reasons. First, Khan failed to identify a protected liberty interest that was violated. *Id.*; *see Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (The Due Process Clause as applied to the states through the Fourteenth Amendment protects the liberty to "pursue a calling or occupation, and not the right to a specific job."). Second, Khan didn't show a qualifying policy or custom that caused her injury. *Khan,* 2018 WL 6192191, at *5; *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978) (Local government liability under § 1983 depends on a showing that the "execution of a government's policy or custom ... inflicts the injury."). Dismissal was without prejudice, *see Khan*, 2018 WL 6192191, at *9, but plaintiff never tried to bring her due process claim again.

Khan has another § 1983 claim, styled as "Due Process/First Amendment/Equal Protection – Monell Claim." [258] at 10. Despite the mention of due process in its title, however, and the existence of the same factual allegations that undergirded Khan's due process claim, this § 1983 claim isn't about procedural

due process, and the words "Due Process" alone aren't enough to state such a claim. *See* Fed. R. Civ. P. 8; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (conclusory legal statements aren't enough to state a claim). Instead, as discussed above, Khan's remaining § 1983 claim centered on an allegation that the Board retaliated against her for exercising her First Amendment rights. *See* [258] ¶ 124. Khan admitted as much in her briefing, where she characterized this claim as one for "federal retaliation." *See* [434] at 14.

Khan fails to turn her remaining § 1983 claim into one for a violation of her due process rights (or, alternatively, to resurrect her dismissed claim). Plaintiff can't amend her complaint "through arguments in [her] brief to a motion for summary judgment," *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012), and "may not use her brief opposing summary judgment to introduce claims not stated in her complaint." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 693 (7th Cir. 2010). Even if Khan had a viable due process claim, the flaws that cut down that claim in the first place haven't been addressed. Khan didn't have a protected liberty interest in her job as principal of Aldridge. *See Wroblewski*, 965 F.2d at 455. And Khan hasn't shown that the Board (rather than its employees) caused her injury. *See Monell*, 436 U.S. at 694–95.

Khan doesn't have a due process claim remaining. Even if she did, defendant's motion is granted as to that claim.

### C.    Title VII

To succeed on her retaliation claim under Title VII, Khan must prove that she suffered an adverse action because she engaged in statutorily protected activity. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). Protected activity is when an employee opposes her employer's non-compliance with Title VII. 42 U.S.C. § 2000e-3(a). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). An adverse action is one that would dissuade a reasonable employee from engaging in protected activity. *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)).

Khan argues that she engaged in protected activity under Title VII by complaining to HR, Kirby, the Board's OIG. [434] at 29. Khan didn't say what conduct she initially complained about to HR. *See* [446] ¶ 12; [436-8] ¶ 15. Khan complained to HR and Kirby about Saffold and her staff's harassment, but didn't say on what basis she was harassed. *See* [446] ¶¶ 14–15, 43; [433] ¶ 138. The complaint to the Inspector General was about Saffold's misappropriation of funds and budget interference. *See* [446] ¶ 18; [433] ¶ 141. Because Khan's complaints to HR, Kirby, and the OIG weren't about discrimination on the basis of a characteristic protected by Title VII, they weren't protected activity under the statute and can't support

23

Khan's Title VII retaliation claim. *See Miller*, 20 F.4th at 1155 (citing *Smith v. Illinois Dep't of Transp.*, 936 F.3d 554, 559–60 (7th Cir. 2019)).

Khan's EEOC charge alleged discrimination and retaliation on the basis of protected characteristics—race, gender, and religion, [433] ¶ 149—and could be protected activity under Title VII. *See Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003) (the filing of an EEOC charge of discrimination satisfies the protected activity requirement). But even if the EEOC complaint was protected activity, there's no evidence that the Board knew about it, *see* [433] ¶ 152, which means Khan hasn't shown that the Board acted because of her EEOC complaint. *See Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512 (7th Cir. 2021) (citations omitted) ("In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity.").

Khan hasn't shown that her internal complaints were protected activity under Title VII or that her EEOC complaint was causally related to the Board's actions. Summary judgment is granted to the Board on the Title VII claim.

## D.    State-Law Claims

Having dismissed the remaining federal claims, this court has discretionary jurisdiction over the supplemental state-law claims. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). A court may—but is not required to—decline to exercise supplemental jurisdiction over state-law claims upon dismissal of "all claims over which it has original jurisdiction."

28 U.S.C. § 1367(c)(3). The presumption is that when federal claims drop out, the district court ought to relinquish jurisdiction over state-law claims. *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 812 (7th Cir. 2021) (citing *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007)).

Plaintiff hasn't made any argument that I should retain jurisdiction over her state-law claims, *see* [434], while defendants have asked that I relinquish jurisdiction over those claims. [417] at 34. There is no federal interest in this remaining state-law employment dispute, so I decline to exercise supplemental jurisdiction over Khan's state-law claims. The state-law claims are dismissed without prejudice.

## IV. Conclusion

Plaintiff's motion to voluntarily dismiss some claims, [430], is granted. Defendants' motion for summary judgment, [416], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

March 8, 2022